**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**SELVIN DANIELS, III,**

      **Petitioner,**

**v.**                       **Case No. 4:13cv656-MW/CAS**

**FLORIDA DEPARTMENT OF
CORRECTIONS,**

      **Respondent.**

_____/

## <u>REPORT AND RECOMMENDATION TO DENY § 2254 PETITION</u>

On December 4, 2013, Petitioner Selvin Daniels, III, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1.   On November 12, 2014, Respondent filed an answer.   ECF No. 14.   Respondent also filed exhibits.   ECF No. 16.   Petitioner has not filed a reply, although given the opportunity to do so.   *See* ECF Nos. 17, 20.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).   After careful consideration of all issues raised, the undersigned has determined that no evidentiary

hearing is required for disposition of this case.   *See* Rule 8(a), R. Gov.

§ 2254 Cases in U.S. Dist. Cts.   For the reasons stated herein, the

pleadings and attachments before the Court show Petitioner is not entitled

to federal habeas relief, and this § 2254 petition should be denied.

## Background and Procedural History

By information filed July 12, 2005, in case number 05CF02268,

Second Judicial Circuit, Leon County, the State of Florida charged

Petitioner, Selvin Daniels, III, with one count of second degree murder, a

first degree felony, in violation of section 782.04(2), Florida Statutes, in

connection with events that took place on or about June 25, 2005, involving

the death of Lisa E. Hamilton.   Ex. A at 1.[1]   On July 21, 2005, a grand jury

indicted Daniels for first degree murder, in violation of section

782.04(1)(a)1., Florida Statutes.   *Id.* at 2-3.   On August 9, 2005, the State

filed a notice of intent to seek the death penalty.   *Id.* at 22.

Daniels proceeded to a jury trial on October 22 and 23, 2008, before

Judge Angela C. Dempsey.   Exs. C-E (trial transcript).   Daniels did not

---

[1]Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits, ECF No. 16, submitted with Respondent's answer.

textify.   Ex. D at 386.   The jury found him guilty of first degree murder.
Ex. A at 142-43; Ex. E at 561-62.   The penalty phase of the trial took place
on October 24 and 28, 2008, and, as the advisory sentence, the jury
recommended imposition of life imprisonment without the possibility of
parole.   Ex. A at 141; Ex. G at 702.   On October 29, 2008, the court
adjudicated him guilty and sentenced him to life in prison without the
possibility of parole.   Ex. A at 147-54; Ex. G at 704.

Daniels appealed his conviction and sentence to the First District
Court of Appeal (DCA), assigned case number 1D08-5780.   Ex. H (Initial
Brief); Ex. I (Answer Brief).   On February 17, 2010, the First DCA affirmed
the case per curiam, without a written opinion.   Ex. J; Daniels v. State, 28
So. 3d 48 (Fla. 1st DCA 2010) (table).   The mandate issued March 5,
2010.   Ex. J.

On September 9, 2010, Daniels filed a pro se motion for post-
conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 in the
state trial court.   Ex. K at 1-43 (exclusive of exhibits).   The State filed a
response on December 15, 2010, requesting an evidentiary hearing.   Ex. L
at 231-32.   The state post-conviction court, Judge Dawn Caloca-Johnson,

held an evidentiary hearing on December 14, 2012, during which Daniels was represented by counsel.   Exs. M, N.   At the conclusion of the hearing, the judge made oral findings and, in an order rendered December 17, 2012, the judge denied Daniels' Rule 3.850 motion "for reasons announced on the record."   Ex. L at 412; *see* Ex. N at 221-55.

Daniels, represented by counsel, appealed to the First DCA and filed an initial brief in case number 1D13-0148.   Ex. O.   The State filed an answer brief.   Ex. P.   On August 14, 2013, the First DCA per curiam affirmed the appeal without a written opinion.   Ex. Q; Daniels v. State, 118 So. 3d 223 (Fla. 1st DCA 2013) (table).   The mandate issued August 30, 2013.

In the meantime, on October 11, 2011, through counsel, Daniels filed a second amended Rule 3.850 motion.   Ex. L at 393-406.   In this motion, he argued he was entitled to a new trial, pursuant to State v. Montgomery, 39 So. 3d 252 (Fla. 2010), based on the jury instruction read at his trial for manslaughter by intentional act.   *Id.*   The state post-conviction trial court summarily denied this motion on December 9, 2011, noting that every state district court of appeal has determined the Montgomery case does not

apply retroactively.   *Id*. at 410-11.   The court further noted that the

Montgomery opinion was issued April 8, 2010, and Daniels' judgment and

sentence became final over a month earlier, on March 5, 2010, when the

First DCA issued its PCA in his direct appeal.   *Id*.

As indicated above, Daniels filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 in this Court on December 4, 2013.   ECF

No. 1.   He raises four grounds, including two alleging ineffective

assistance of counsel (IAC):

> (1)   Trial Court Error – Motion for Mistrial:   The trial court prejudicially erred in denying the defense motion for mistrial after the prosecutor commented on Daniels' Fifth Amendment right to remain silent in violation of his constitutional rights and contrary to clearly established federal case law.   *Id*. at 4-5.

> (2)   Trial Court Error – Jury Instructions:   Petitioner Daniels is entitled to a new trial because the trial court erroneously instructed the jury on manslaughter by intentional act, a necessary lesser charge, and because the Florida Supreme Court recently pronounced, for the first time, that such error violates a defendant's right to a fair trial in violation of his federal constitutional rights and contrary to clearly established federal law. *Id*. at 5-10.

> (3)   IAC – Trial counsel was ineffective for failing to (a) investigate and call exculpatory witnesses, (b) take depositions, and (c) put Daniels on the stand, in violation of his federal constitutional rights and contrary to clearly established federal case law.   *Id*. at 11-22.

(4)   IAC – Trial counsel was ineffective for failing to prepare an adequate theory of self-defense, in violation of Daniels' federal constitutional rights and contrary to clearly established federal case law.   *Id.* at 23-28.

Respondent has filed an answer, with exhibits.   ECF Nos. 14, 16.

Petitioner has not filed a reply, although he was given the opportunity to do so.   *See* ECF Nos. 17, 20.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody.   Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   *See, e.g.,* <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398

(2011); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Gill v. Mecusker</u>, 633 F.3d

1272 (11th Cir. 2011).   "This is a 'difficult to meet' and 'highly deferential

standard for evaluating state-court rulings, which demands that state-court

decisions be given the benefit of the doubt.'"   <u>Cullen</u>, 131 S.Ct. at 1398

(quoting <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011), and <u>Woodford v.</u>

<u>Visciotti</u>, 537 U.S. 19, 24 (2002)).   This Court's review "is limited to the

record that was before the state court that adjudicated the claim on the

merits."   <u>Cullen</u>, 131 S.Ct. at 1388.

For claims of ineffective assistance of counsel (IAC), the U.S.

Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was
> deficient.   This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.   Second,
> the defendant must show that the deficient performance
> prejudiced the defense.   This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

<u>Strickland</u>, 466 U.S. at 687.   To demonstrate ineffectiveness, a "defendant

must show that counsel's performance fell below an objective standard of

reasonableness."   *Id.* at 688.   To demonstrate prejudice, a defendant

"must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."   *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*   For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the <u>Strickland</u> standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"   <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quoting <u>Schiro v. Landrigan</u>, 550 U.S. 465, 473 (2007)).   "And, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."   *Id.*   It is a "doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard."   *Id.*

### <u>Ground 1</u>:   Trial Court Error – Denial of Motion for Mistrial

In his first ground, Petitioner Daniels argues the state trial court erred in denying his motion for a mistrial after the prosecutor commented, during closing argument, on his Fifth Amendment right to remain silent.   ECF No. 1 at 4-5.   Daniels raised this claim in state court as the first point in his direct appeal.   Ex. H at ii, 6-9.   The First DCA per curiam affirmed the appeal without a written opinion.   Ex. J.   The state court's ruling is entitled

to deference and review is limited to the record before the state court.   *See*

Cullen, 131 S.Ct. at 1388.

The record supports the state court's determination.   The record

reflects that, during the State's rebuttal closing, the prosecutor made the

following statements, in pertinent part:

> You're not being shown this evidence for any other reason than to meet the burden the State has and that is to prove to you beyond a reasonable doubt that Ms. Lisa Hamilton is dead and the defendant is the person who killed her in premeditated murder.   It wasn't just a struggle where he lashed out with a knife and stabbed her and happened to hit an organ where she died instantly.   These are gory because the defendant made them gory because he did this.   He sliced up this woman.   He beat her in the head with this brick.

> We don't create the evidence and we don't pick the witnesses.   The defendant in this case does that.   And we are showing you what his hands did in the early morning hours of June 25th of the year 2005 as she struggled to get out of that bedroom, not in the bathroom, as she struggled to get out of that bedroom.   And why do we say that?   Because she is halfway in the bedroom, halfway in the kitchen, her throat's slit, blood everywhere, all over the mattress.   She was clearly trying to get out of that bedroom.

> Self-defense.   Let's look at the evidence of self-defense, ladies and gentlemen.   Let's look at the defendant.   Bashed in the head with a brick.   Maybe he was acting in self-defense. There is not a mark on his torso, not one mark.   He has got some old injuries on his back.

> Where's the self-defense?   Where's the injuries to Selvin Daniels?   He has got some scraps [sic] on his knees.   Maybe

that happened when was [sic] jumping on or off a train?

Here's the big injury to Selvin Daniels.   You have got look [sic] close at it.   This is the injury that Selvin Daniels had on June 25th of the year 2005.   It is a little nick, less than an inch, to his finger.   Self-defense?   There's no injuries to him other than that little nick to his hand.

There is only one victim in this case and she is dead. And there's only two people that know what happened in that house and one of them can't tell you what happened because she is dead.

Ex. E at 518-20 (emphasis added).   Defense counsel then objected and

the following transpired:

MR. D. COLLINS [defense counsel]:   Your Honor, I would make an objection.   I request a side bar.

(A Bench Conference was held as follows:)

THE COURT:   Mr. Collins?

MR. D. COLLINS:   Your Honor, I'll make a motion for mistrial. Ms. Ray has made an impermissible comment on my client's right to remain silent.   If you have any question about this, I need time to go look at the West Law and pull up the appropriate case law.   That's absolutely, absolutely improper. You can never ask that question.

THE COURT:   Have you talked to your client about what – for a mistrial?

MR. D. COLLINS:   We will talk to him about it right now.   I have not, in good faith.

MS. RAY [prosecutor]:   Judge, there was – my argument would

be that I was countering an argument that nobody knew what went on in that house, and all I said is, There's only two people that know what went on and one of those people is dead. That's the only comment I made.

MR. D. COLLINS:   It's not a justification, Judge.   You can't do that.   You can't say that.   That's an indirect inference on my client's right to remain silent.

Let me ask my client.

THE COURT:   Okay.   I think Mr. Harrison [defense co-counsel] went to talk to him.

MR. D. COLLINS:   May I be excused for a second?

THE COURT:   Sure.

MR. D. COLLINS:   Thank you.

(Pause.)

MR. D. COLLINS:   Selvin has gave his permission to request a mistrial.

THE COURT:   Okay.   I don't think that would [sic] comment in and of itself, raises to the level of – meet appropriate [sic] for a mistrial.

Knowing that that's my ruling, are you asking for a curative instruction?

MR. D. COLLINS:   Yes, Your Honor.

THE COURT:   What would you suggest that I say?

MR. D. COLLINS:   I would ask that you ask the jury to strike that last comment and disregard it, that the defendant has an

absolute right to remain silent at all times.   That could never be used against him.

THE COURT:   Okay.   Do you want to be heard on that, Ms. Ray?

MS. RAY:   No.

*Id*. at 520-22.   The bench conference concluded and the trial judge then instructed the jury:

THE COURT:   All right.   I'm going to instruct the jury to disregard that last comment and remind you that the defendant has an absolute right to remain silent and the fact that he choose [sic] not to testify in this case cannot be used against him at all.   Thank you.

*Id*. at 522.

In Florida, both the State and the defense have wide latitude in closing arguments.   *See* Ford v. State, 802 So. 2d 1121, 1129 (Fla. 2001). In federal habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).   The comments must have been improper and have rendered the trial fundamentally unfair.   United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991).   A review of this record does not indicate the prosecutor's

comment, even if questionable, rose to such a level as to result in an unfair

trial or deprivation of due process.   *See* Darden, 477 U.S. at 181 (finding

that prosecutor's comments "undoubtedly were improper," but that was not

enough for habeas corpus relief as the question was whether the

comments "so infected the trial with unfairness as to make the resulting

conviction a denial of due process").

"To find prosecutorial misconduct, a two-pronged test must be met:

(1) the remarks must be improper, and (2) the remarks must prejudicially

affect the substantial rights of the defendant."   United States v. Eyster, 948

F.2d 1196, 1206 (11th Cir. 1991).   The Eleventh Circuit has explained:

> In determining whether the act of misconduct rendered
> the trial fundamentally unfair, we measure the remark against
> the totality of the facts and circumstances.   Hall v. Wainwright,
> 733 F.2d 766, 773 (11th Cir. 1984).   "In determining whether
> arguments are sufficiently egregious to result in the denial of
> due process," facts such as the following may be considered:
> "(1) whether the remarks were isolated, ambiguous, or
> unintentional; (2) whether there was a contemporaneous
> objection by defense counsel; (3) the trial court's instructions;
> and (4) the weight of aggravating and mitigating factors."   Land
> [v. Allen, 573 F.3d 1211,] 1219-20 [(11th Cir. 2009)].
> Moreover, we consider "the degree to which the challenged
> remarks have a tendency to mislead the jury and to prejudice
> the accused," and "the strength of the competent proof to
> establish the guilt of the accused."   Davis v. Zant, 36 F.3d
> 1538, 1546 (11th Cir. 1994).   Thus, where the evidence of guilt
> is overwhelming, an improper comment by a prosecutor usually
> does not render the trial fundamentally unfair in violation of the

Constitution.   *See* Land, 573 F.3d at 1220.

Spencer v. Sec'y, Dept. of Corr., 609 F.3d 1170, 1182 (11th Cir. 2010).

Specifically addressing comments on a defendant's right not to testify, the

Eleventh Circuit has explained:

> "The Fifth Amendment prohibits a prosecutor from
> commenting directly or indirectly on a defendant's failure to
> testify."   A prosecutor's statement violates the defendant's right
> to remain silent if either (1) the statement was *manifestly
> intended* to be a comment on the defendant's failure to testify;
> or (2) the statement "was of such a character that a jury would
> naturally and necessarily take it to be a comment on the failure
> of the accused to testify."   The question is not whether the jury
> possibly or even probably would view the remark in this
> manner, but whether the jury *necessarily* would have done so.
> "The defendant bears the burden of establishing the existence
> of one of the two criteria."   The comment must be examined in
> context, in order to evaluate the prosecutor's motive and to
> discern the impact of the statement.   Because the trial judge is
> the only person who has the opportunity to observe the
> prosecutor's demeanor firsthand, we review the district court's
> denial of the motion for mistrial for abuse of discretion.

United States v. Knowles, 66 F.3d 1146, 1162-63 (11th Cir. 1995)

(footnotes and citations omitted).   *See, e.g.*, United States v. Blankenship,

382 F.3d 1110, 1128 (11th Cir. 2004) ("A solitary comment would have to

be much more prejudicial to the defendant in some way before we reverse

a conviction on that basis.").

Here, the prosecutor's remark during closing argument, quoted

above, albeit improper, did not render Daniels' trial fundamentally unfair.

The remark was a single isolated comment, there was a contemporaneous

objection by defense counsel which the trial court sustained, and the trial

court immediately gave a curative instruction.   Indeed, given the curative

instruction, the jury should not have taken the remark as a comment on

Daniels' decision not to testify.

Moreover, given the context, the comment can be considered as one

arguing the defense did not prove Daniels had acted in self-defense.   The

State had shown Daniels was standing near the victim with a brick in his

hand, the victim asking Daniels to stop hitting her, the victim's DNA was on

the brick and the knife, the victim's head was bleeding, the victim was

screaming and saying Daniels was trying to kill her, Daniels dragged the

victim into the house by her feet and legs, the violent nature of the killing

(knife wound across throat), the defensive wounds on the victim, and the

relative lack of injury to Daniels.   Ex. B at 69, 76-79, 109-12; Ex. C at 164-

69, 176-89, 199-200, 296-99; Ex. D at 347-62.   The State had also

introduced a tape-recorded interview of Daniels' uncle, Dale Daniels, with a

Tallahassee Police Department Investigator.   Ex. C at 232-41.   During the

interview, Dale Daniels explained what the Petitioner had told him on June

25, 2005, the day of the murder:

> He had told me, he said, uncle, uncle, I got myself in some real
> good bad trouble, I mean, bad, bad, bad.   I said, Boy, what you
> done did, then.   Boy, tell me what you done did.   He said him
> and this girl was over to his house, and they were smoking and
> getting high and all of that . . . And he had, he had, had the
> knife on the table or something.   He told me he just cut her
> throat, see.   He had – she didn't want to give me his dope or
> something and they got in an argument.   And he said, well,
> give me my dope.   And she tried to run and he cut her throat.
> That's about all he said.

Ex. C at 237.

Petitioner Daniels has not shown that the state court's adjudication of

this ground involved an unreasonable application of clearly established

federal law or that it based on an unreasonable determination of the facts.

*See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be

denied.

## <u>Ground 2</u>:   Trial Court Error – Jury Instruction

In his second ground, Petitioner Daniels asserts the trial court

erroneously instructed the jury on manslaughter by intentional act and he is

entitled to a new trial pursuant to <u>State v. Montgomery</u>, 39 So. 3d 252 (Fla.

2010).   ECF No. 1 at 5-10.   Daniels raised this claim, through counsel, in

his second amended Rule 3.850 motion:

THE DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE

HIS CONVICTION WAS OBTAINED CONTRARY TO
FLORIDA LAW WHERE THE TRIAL COURT ERRONEOUSLY
INSTRUCTED THE JURY ON MANSLAUGHTER BY
INTENTIONAL ACT, A NECESSARY LESSER CHARGE, AND
WHERE THE SUPREME COURT RECENTLY PRONOUNCED
FOR THE FIRST TIME, THAT SUCH ERROR VIOLATES THE
DEFENDANT'S RIGHTS TO A FAIR TRIAL.

Ex. L at 393; *id.* at 393-406.   The state post-conviction court denied the

claim, making the following findings:

On or about October 27, 2008, Defendant was found
guilty by a jury of First-Degree Murder and sentenced to life
imprisonment in the Department of Corrections.   He now
claims, among other things, that the manslaughter instruction
given in his case was erroneous, and that his conviction must
be vacated pursuant to State v. Montgomery, 39 So. 3d 252
(Fla. 2010).   He acknowledges that at the time of his trial the
instruction was correct under Florida law.

Every district court to address such a claim has held that
Montgomery does not apply retroactively.   *See, e.g.*, Maxwell
v. State, 69 So. 3d 1122 (Fla. 3d DCA 2011) (citing Witt v.
State, 387 So. 2d 922 (Fla. 1980)); Ross v. State, 2011 Fla.
App. LEXIS 12516 (Fla. 4th DCA 2011); Harricharan v. State,
59 So. 3d 1162 (Fla. 5th DCA 2011); *cf.* Rozzelle v. State, 29
So. 3d 1141, 1142 (Fla. 1st DCA 2009) (holding that the First
District Court's predicate opinion in Montgomery that giving the
instruction for manslaughter by act as a lesser-included offense
of second-degree murder constituted fundamental error, but not
addressing harmless error, was not retroactive).

The Montgomery opinion was issued on April 8, 2010.
Defendant's judgment and sentence became final when they
were *per curiam affirmed* by mandate issued over a month
earlier on March 5, 2010 (DCA Case No. 1D08-5780).
Consequently, the claim must fail.

*Id.* at 410-11.   On appeal, the First DCA affirmed.   The state court's ruling is entitled to deference and review is limited to the record before the state court.   *See* Cullen, 131 S.Ct. at 1388.

"State court jury instructions ordinarily comprise issues of state law and are not subject to federal habeas corpus review absent fundamental unfairness."   Jones v. Kemp, 794 F.2d 1536, 1540 (11th Cir. 1986). When a federal habeas petitioner challenges a state trial court jury instruction as improper, "[t]he question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' . . . . not merely whether 'the instruction is undesirable, erroneous, or even 'universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).   "A defective jury charge raises an issue of constitutional dimension only if it renders the entire trial fundamentally unfair."   Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983). Indeed, "federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, 'so infected the entire trial that the resulting conviction violated due process.'"   Jamerson v. Sec'y for Dep't of Corr.,

410 F.3d 682, 688 (11th Cir. 2005) (quoting Estelle, 502 U.S. at 72); *see,*

*e.g.*, Agan v. Vaughn, 119 F.3d 1538, 1545 (11th Cir. 1997) ("A defendant's

right to due process is not violated unless an erroneous instruction, when

viewed in light of the entire trial, was so misleading as to make the trial

unfair."); Jacobs v. Singletary, 952 F.2d 1282, 1290 (11th Cir. 1992) ("An

error in instructing the jury cannot constitute a basis for habeas relief

unless the error 'so infected the entire trial that the resulting conviction

violates due process.'" (quoting Henderson, 431 U.S. at 154)).

Daniels alleged that the trial court erred as a matter of state law.   Ex.

L at 393.   As the state court found, however, at the time of Daniels' trial in

October 2008, the jury instruction given was correct under Florida law.

*See* Ex. E at 435-40 (jury instructions given during trial); Fla. Std. Jury Instr.

(Crim.) 7.7 (2007); In re Std. Jury Instr. in Crim. Cases – No. 2006-1, 946

So. 2d 1061 (Fla. 2006).   Moreover, "the fact that [a jury] instruction was

allegedly incorrect under state law is not a basis for habeas relief."

Estelle, 502 U.S. at 71-72.   *See, e.g.,* Joseph v. Sec'y, Dept. of Corr., 567

F. App'x 893, 894 (11th Cir. 2014); Smith v. Jones, No. 5:13cv301-

WS/CJK, 2015 WL 7444825, at *31-38 (N.D. Fla. Sept. 6, 2015) (Report

and Recommendation rejecting petitioner's argument based on

<u>Montgomery</u> that trial court committed fundamental error in instructing jury).

Daniels has not shown that the state court's adjudication of this ground involved an unreasonable application of clearly established federal law or that it based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be denied.

### <u>Ground 3</u>:   IAC – Failure to Investigate and Call Witnesses

In his third ground, Petitioner Daniels alleges his trial counsel provided ineffective assistance by failing to (a) investigate and call exculpatory witnesses (Monica Jordan, Deborah Mash, an independent expert pathologist, Ruby Taylor, and Carlton Bryant), (b) take depositions of eyewitnesses (Christopher Graddy and Christina Miller), and (c) have him testify in his own defense.   ECF No. 1 at 11.   Daniels raised these claims as the second ground in his Rule 3.850 motion.   Ex. K at 15-29.

### (a)  <u>Investigate and Call Exculpatory Witnesses</u>

In denying this claim, the state post-conviction court made the following findings on the record at the conclusion of the evidentiary hearing:

> First, I don't find, based on the testimony today, my review of the file, that there was any lack of investigation.   I mean, the defendant was afforded the opportunity to have a private investigator [Monica Jordan].   Now, I understand that she wasn't as active when Mr. Collins and Mr. Harrison got on board.   She did speak with Mr. Harrison.

As she even testified, her main concern was the death penalty in this case.   That was what she was focused on.   She wasn't so much concerned about the guilt phase of the case. And if you want to break it down into ineffectiveness and prejudice, I guess even if you were to say that Mr. Collins was somehow ineffective in the – or Mr. Harrison, I guess, who had the primary role in the penalty phase, even if you wanted to say, okay, they were ineffective, well, they were obviously effective enough to keep Mr. Daniels off death row.   Because they succeeded in what their major concern was, which was to get him a life sentence and not a death penalty sentence.

So in my mind, I have to look at this – you know, death penalty cases are two-phase cases.   So if we look at – if we consider Monica Jordan's testimony today about what her main concern was and what her focus was on the case, certainly counsel was effective in convincing the jury to come back with a recommendation of life and not death.

Now, when you move to the guilt phase of the trial, some argument was made, and Ms. Jordan – there was some testimony from her about the victim's background; how violent she was and all of those sorts of things.

Well, first of all, I don't know how that was coming in in the guilt phase.   Certainly it wasn't coming in through Ms. Jordan.   Because I agree with the State, that's hearsay.   She is not going to be allowed to get up and talk about whatever court records [involving the victim] she went out and found.

And then we have to get to the question of, again, it is probably more of a factual matter.   If the defense wanted to posit the self-defense theory and hang their hat on the fact that she was high on cocaine and flew off the handle and attacked Mr. Daniels, and if I'm to believe Mr. Daniels's testimony, which, I think, quite honestly, defies all credibility in light of all the other evidence in this case, if you're to believe him, then his

testimony, in my mind, and based on the evidence in the case is completely inconsistent with the wounds suffered by the victim that killed her, which was sawing through her neck to the point that it went through her esophagus – well, it first when through her trachea, went through the esophagus, all the way to her spinal vertebra.

And it defies logic that the defendant could be in a self-defense posture, which he maintains here today on his testimony, with one sweeping blow to the victim to get her off of him, coupled with all of her defense wounds; it just defies logic.

So I think sufficient investigation was done.   No one has identified any – well, let me back up to that.   So even if you could have maybe gotten in the evidence of the victim's bad acts, the other evidence in the case – first of all, I don't think it would have helped the defendant at all.   I think it would have actually potentially hurt him.

But I don't think that it was prejudicial to the defendant that – first of all, I don't think it would come in.   And, second of all, if it could come in, I don't think it would be prejudicial and change the outcome, given the nature of the victim's injuries.

You know, if it was a scenario where – I don't think it's disputed.   Nobody was there at a certain point in the house when she got her throat cut.   If her injury would have been a stab wound – one stab wound to the chest or something like that, it might have been a different scenario in the defense. But to have the injury that ultimately killed her, I don't think that any of that evidence would have swayed a jury and changed the outcome of the conviction.

          . . . .

          Okay.   Let's see.   I'm trying to walk through this one at a time.   Bear with me.   Ms. Taylor, not calling Ms. Taylor, and I don't know if this was specifically raised.   But Ms. Taylor never

saw the items that she says were missing that were found – whatever items were found in the victim's purse.   And, again, I don't know that that helps the defendant by pointing out that he has this lady over at his house that is this really bad person, who steals stuff.

Again, if we also assume that it was defective not to call the drug dealer, Mr. -- . . . Bryant, that it is – so they get into an argument over items that ultimately – I mean, we kill somebody because we – they either steal your drugs or they steal some items that you think they stole.   I mean, it just doesn't – doesn't add up.

And it would not have changed – I don't think it was ineffective not to call her during the guilt phase.   And it certainly wasn't prejudicial to the ultimate outcome of the case.

I think I have talked sufficiently about Dr. Mash, unless y'all need me to make any additional findings.

I think Dr. Goldberger is the same thing.   He could have testified she had cocaine in her system.   But, first of all, there is no evidence that Dr. Mash would have come up here and said that the level of cocaine she had in her system would have necessarily resulted in behavior to such an extent that it induced – it required such a violent response from the defendant, number one.

Especially again – this, again, hurts him.   If – we don't know what she would say, but assuming she would say that that was the case, then we're to believe that a victim that is this out of control manages to put a couple scratches on this defendant?   I don't think that the outcome would have changed, even if that was the testimony.   But I don't think you can rely on Dr. Mash because we don't know what she would have said.

And Dr. Goldberger's testimony today was, yeah, she had

recently ingested cocaine, but nothing in his testimony
suggested as to what mental state that would have put the
victim in.

. . . .

Again, there was some mention in the defendant's motion
about, and I think we did hear a little bit today, about failure to
call – for counsel to have an independent medical examiner
review the autopsy of the victim and the photographs.

Again, we didn't have a medical examiner testify here
today that there would have been any different opinion as to
how the victim died or as to any defensive injuries on either the
victim or the defendant that would change or contradict the
testimony of Dr. Stewart at the trial.   So that was not – we don't
know – No. 1, given the nature of how the victim died, I think
Mr. Collins was reasonable in determining that he didn't need a
second medical examiner.   It was pretty obvious how the victim
died.

And you certainly, from that standpoint, wouldn't want to
be cumulative in bringing that in front of a jury with your own
expert.   That would probably be an effective trial strategy.   But
there is no evidence before the Court that any of the evidence
submitted by the State would have been contradicted by a
different medical examiner because we don't have that
testimony before the Court to consider.

Ex. N at 225-32.   On appeal, the First DCA affirmed.   The state court's

ruling is entitled to deference and review is limited to the record before the

state court.   *See* <u>Cullen</u>, 131 S.Ct. at 1388.

The record supports the state post-conviction court's findings.   In

particular, Petitioner's lead trial counsel, David Collins, testified at the

evidentiary hearing regarding his trial preparation and strategy:

Q   Now, with regard to the second ground in the [Rule 3.850] motion, failure to call witnesses.   In a case of self-defense, do you agree that that is an affirmative defense?

A   If you've got the facts for it, yes.

Q   Prior to trial, did you intend on calling any witnesses to support the self-defense theory?

A   I don't remember.

Q   Was there anyone else on the witness list for the defense besides Dr. Mash, Keith Gilbert and Danny Brown, who were paramedics, and a Dr. Kracht, it's K-R-A-C-H-T?

A   I don't know.   I cannot remember.

Q   Did you subpoena any witnesses for the defense for trial?

A   I don't remember.

Q   Had you made a determination prior to trial that you were or were not going to call any defense witnesses?

A   I don't remember.   I generally don't make any firm decision one way or another because you never know how a trial is going to go.   So you can't commit – in these kind of cases it is hard to commit in opening statement because the evidence was really not that favorable to self-defense, is what I found myself with.

But there were witnesses who saw the altercation outside first.   And our defense – none of those witnesses would have testified favorably for us in terms of a self-defense.   So the theory, as I recall, was there was some makeup time inside the house and then that's when she attacked him.   And so there

wouldn't have been any witnesses that would have actually
seen the altercation that ended her life.

Q   Can you explain for the Court how you were planning on
asserting a self-defense theory then?

A   Well, I think there was found either a knife or some type of
sharp weapon in her purse that was in the house.

Q   So were you relying just on the fact of – that another knife
was found on the victim?

A   I don't really remember.

Q   What did you base – during the trial you had requested the
self-defense jury instruction.   What did you base that request
on?

A   I based that request on the fact that since I couldn't argue
for second degree murder, and the request was all or nothing, I
based that request on hoping that I could convince the jury that
since there were no witnesses inside that house, what I believe
happened.   Sometimes that's all you got.

Ex. M at 60-61.   Mr. Collins could not recall many specifics from the

testimony of witnesses or potential witnesses, but he again explained that

the self-defense theory, which Petitioner insisted he pursue, was difficult in

this case:

Q   Do you recall a man named Dale Daniels who testified
during the trial, Mr. Daniels's uncle?

A   I think he might have testified, but I don't remember.   I
know he wasn't helpful.

Q   Was your request for the self-defense instruction in any way based on his testimony?

A   I can't recall.

Q   Did you know prior to trial what Dale Daniels' testimony was going to be?

A   I'm sure I did, but I don't remember.

Q   Did you have a discussion with Mr. Daniels prior to trial about whether or not you were going to call any witnesses?

A   I don't remember.

Q   Did you have a discussion with Mr. Daniels prior to trial about whether or not you were going to call any witnesses?

A   I don't remember.

Q   Are you familiar with Monica Jordan of Jordan Consulting?

A   Yes, ma'am.

Q   Was she on the case as an investigator prior to you being appointed?

A   I don't know when she got on the case.   I do remember her being involved in the case.

Q   When you were appointed to the case, did she stay on the case with you?

A   I don't remember.

Q   Do you remember if you consulted with her about what investigation she had already done in the case?

A   No.   (Pause.)   I don't remember.

Q   Oh, I'm sorry.   Did she provide information or documentation to you that she had collected in the last year of her investigation?

A   I don't remember if she did or didn't.   If she did, I'm not disputing it.

Q   Do you recall whether it was Ms. Jordan who suggested to contact Dr. Mash about the cocaine rage?

A   I don't remember.

Q   Do you have any knowledge of any investigation done by Ms. Jordan regarding Lisa Hamilton's background?

A   I don't remember.

Q   Were you aware of whether – or were you aware of the fact that Ms. Hamilton had prior felony convictions for armed robbery, aggravated battery with a deadly weapon, aggravated assault with a weapon, and kidnapping?

A   She is dead.   How does that get into evidence?

Q   Well, my question at this point is were you aware prior to trial?

A   I may have been.   I don't remember.

Q   Were you aware that in a self-defense case, evidence of the victim's reputation and specific acts of violence are admissible if the defendant knows about them?

A   I'm aware of that principle.   I don't know how it applies in this case.

Q   Can you explain that?

A   Well, in this case you've got someone who has been killed in a very heinous manner.   And I don't know.   I don't know if I can explain it any better than that.   She is dead.   And you're trying to float on some really treacherous water by, on one hand, having a defense that, one, you really didn't want to pursue, you wanted to pursue second degree murder.   But that's not what your client wants.   And understandably so.

And then you've got to balance that versus, well, what are the real facts?   How are you going to make this defense?   And then you're going to assail the victim, someone that's been really brutally murdered.   And it is a tight spot.   So you balance from a tactical decision how much are you going to go after this person when the evidence was that basically she had been beaten in the head with some type of brick or rock, drug into the apartment, and then basically almost had her head cut off.

So while we're going with self-defense, you know, it is always hard to figure out in that situation, and knowing – also potentially facing the death penalty, how far you want to go on attacking that victim when basically there was, as you already know, some tough facts to assert self-defense.   But, you know, if you're not going to pursue a lesser included to try to avoid the death penalty, then self-defense was the only way you could really go that way since there were no witnesses.

So that's my explanation.   It was kind of tortured, but the case was kind of tortured.

Q   And in going with a self-defense theory, would it have been consistent with that theory to have presented that Mr. Daniels know of this woman's violent history?

A   Yeah, but how do you get that in unless you call him to the stand?

Q   Exactly.

A   Right.   And he – that would not have been a better strategy.
That would not have been a better strategy.   I know you're like,
well, it is an affirmative defense, you need some more.   Well, it
was a tactical affirmative defense.   It was the best thing we
had under what he was wanting us to try to accomplish, but it
was probably not the best way to go.   The best way to go
would have been, in my opinion, to go for second degree.   But
we lucked out.   He doesn't realize it.   And I understand
nobody wants to be in prison for the rest of their lives, but it is a
lot better than sitting on death row.

Q   Did you consider at any point calling Ms. Jordan as a
witness to testify regarding the investigation she had found out
on Ms. Hamilton?

A   I don't think I did because I don't think there was anything
that I was going to use for her in that regard.

*Id.* at 61-65.

Petitioner's trial co-counsel, Baya Harrison, recalled more specifics

about Monica Jordan.   Ex. N at 120; *see* Ex. M at 101-12 (Monica Jordan's

testimony at evidentiary hearing).   Mr. Harrison explained that Monica

Jordan was trying to help the defense team find an expert to testify during

the penalty phase and she had recommended Dr. Mash, so he "set out to

try to line up Dr. Mash's participation in the trial."   Ex. N at 120.   Mr.

Harrison further testified regarding Monica Jordan and Dr. Mash:

Q . . . Was Ms. Jordan still on the case when you were

appointed?

A   As far as I knew, she was. . . . I mean, she is the one that contacted me about Dr. Mash.   So as far as I knew, she was on – you know, if not the clock, she was helping David and me.

Q   Were her notes or reports that she had compiled with regard to her investigation available to you to use?

A   I never saw anything in writing from Mrs. Jordan, but we talked on the phone.   And, you know, we've been doing this a long time so we don't have to go into great detail about things.

I believe the notes and information that she had pertained to the victim.   In other words, there was a contention that the victim was somehow mentally disturbed, heavily addicted to crack cocaine, and all of that.   That really didn't help us much in this case because the facts were – I mean, the obvious facts were that this lady may have been mentally ill, but she didn't start this.   I mean, this was a very aggressive pattern by Mr. Daniels, unfortunately, by – you know, I mean, that was – everybody said that.

And so, I mean, her notes as to the – as to the background of the victim, frankly, really weren't that pertinent. The main thing that Monica was doing was directing me to Dr. Mash.   And so if you want to ask me about that, I'll –

Q   Yes.   Specifically with regard to Dr. Mash, did you actually request that Dr. Mash be appointed in March of 2008?

A   I did.   Based on Monica's recommendation, I filed a motion to have Dr. Mash appointed.   As I recall, that motion was granted.   And in the interim I was trying to communicate with Dr. Mash and to get her involved in the case.

Q   And what was the purpose of retaining a mental health expert such as Dr. Mash?

A   The purpose was to have her do several things.   She would need to come to Tallahassee and to – and to interview Mr. Daniels to test – to provide examinations and tests as to some of the mental health mitigators under Subsection 6 of the mitigation statute.   And so I was trying to involve her in possibly, ultimately, being a witness for the defense on the issue of mental health mitigation.

Q   Was there any consideration of using a mental health expert in the context of negating premeditation during the – during the penalty phase?   Was it all penalty phase or was there any consideration of that during the guilt phase?

A   No, unlike – I read your motion, or whoever wrote that motion.   And the motion is not accurate on certain things.

    If there is any criticism of what was done from a mental health standpoint, that would fall on me, not David Collins.   He is fighting the, you know, lay witness and all of that.   The question of all aspects of the trial, including sanity, competence, you know which are trial issues, that fell on me.

    And Dr. Mash – you say premeditation.   You have to really think about that.   In Florida, you don't have a diminished capacity defense to premeditated murder.   Some people think you do.   I think whoever wrote that motion thought that, but you don't.   The question is in Florida, as far as sanity is concerned, you are either sane or you're not.   As far as competence is concerned, you're either competent or you're not.

    And so Dr. Mash, as I understand it, she is an academician.   She is not – if you read her resume, you can come away thinking she is a medical doctor.   She said she got her postgraduate degree from a medical school.   But she is not a medical doctor.   She is not a psychiatrist.   In fact, I don't even think she is a psychologist.   She has expertise in her own academic field.   And she has this theory about cocaine rage.

Well, that would certainly have some relevance in a penalty phase, but not in the guilt-innocence phase.

And so I hope that – I hope that answers your question there.

Q   Did you feel that she was the most qualified in this area of the effects of cocaine, given her background?

A   Initially, I took Monica's word.   Monica said this lady was extremely qualified.   I must tell you that after speaking to her on the phone at length, I began to have some questions about that.   She is a theoretician.   She has a theory that excessive uses of cocaine, addictive uses of cocaine, can cause a person to, you know, do some pretty irrational things.

But the more I probed – for example, it was my understanding, and the motion says, that Dr. Mash was up to speed on the facts of the case and knew something about Mr. Daniels.   Well, that wasn't what she told me.   In other words, she didn't seem to have a clue as to what this case was about when I spoke to her.

There were other problems.   It was extremely difficult to get her to talk to me.   Apparently she is very busy.   She has a tremendously busy schedule.   But I would have to go through layers of staff to even get her to speak to me on the phone. And when I – when I finally was able to talk to her, I just – I did not feel, for example, that she was really knowledgeable about the mitigation statute under Florida's death penalty law.   She has got this theory about cocaine rage, but, she didn't seem really, really, really knowledgeable about the mitigators under subsection 6 of 921.141.

So, frankly, I started losing confidence in her ability to help us.   And we had a trial date.   You know, we had a trial date.   And we even got – we even got one continuance, if not two, as I recall.   But I could never get the lady to commit to

even come up here.

And so after, you know – also, the defense that Mr. Daniels wished to present was self-defense.   You know, he – he – I mean, there was not any assurance that he was even actually – had done a whole lot of cocaine that day that this homicide had occurred.   So, you know, I just – I could not get this lady on board.   And so that's why I went to David and discussed it, and we decided to get Chris Robison, who is an outstanding psychologist.

Q   Did you consider Dr. Mash's testimony in light of the effects of the cocaine on the victim, Lisa Hamilton?

A   I didn't quite understand the question.

Q   Sure.   You've been talking about Dr. Mash's input as far as cocaine rage on – as it applies to Mr. Daniels.   But was there conversation or did you consider how her testimony might have played into the cocaine rage of the victim?

A   How her use of cocaine played into her – her situation.

Q   Right.   The effects of the cocaine on the victim and how it would have affected her behavior in light of the fact that you were going for a self-defense theory?

A   Well, Mr. Daniels was going for a self-defense.   That was his – that was his theory.   And I think, ultimately, as I recall, he would not let Dave pursue, you know, a lesser-included type offense.

From the facts of the case, I don't see how – I mean, the facts don't fit a scenario where the victim somehow becomes the aggressor, and by her use of cocaine is out there, you know, going crazy and doing all these – doing violent things.   All the evidence is is that she was brutally beaten, whether she was high or not.   She was dragged up some stairs.   She was

bloody on the floor.   The door was slammed in the face of the people trying to get in.   And she had her throat cut.
So, no, I don't see any connection between her use of cocaine and her death.

*Id.* at 120-26; *see id.* at 138-42.

In addition to questions about Monica Jordan, Mr. Collins also answered questions about Dr. Stewart, who had done the autopsy on the victim:

Q   Now, did you review the autopsy report in preparation for trial?

A   Yes.

Q   Was the deposition of Dr. Stewart taken?

A   I don't remember.

Q   Did you have any contact with Dr. Stewart prior to trial?

A   I don't remember.   I don't know.

Q   Did you consult with any other medical examiners or pathologists prior to the trial?

A   No.

Q   Why not?

A   Because in my experience there was nothing they could help me with.

Q   Did you consider retaining an expert to review Dr. Stewart's conclusions?

A   No.

Q   Did you prepare prior to trial to cross-examine Dr. Stewart?

A   I don't know how much preparation I needed, but I prepared to the extent that I thought was necessary.   But, I mean, the cause of death was obvious.

Q   If you recall, you didn't do any cross-examination of Dr. Stewart during trial.   Can you explain why?

A   Probably didn't have any questions I wanted to ask him.

Q   Did you review photographs of Mr. Daniels' injuries prior to trial?

A   Yes.

Q   Did you consider discussing those injuries or showing those photographs to Dr. Stewart?

A   Obviously I didn't if I didn't cross-examine him.

Q   Would it have been important for your defense of self-defense to have gotten an opinion from Dr. Stewart about whether those injuries were consistent with defensive wounds?

A   I don't know.

Q   As part of Dr. Stewart's autopsy, he collected blood from Ms. Hamilton and sent it to a Dr. Goldberger for testing.   Did you review the toxicology report from Dr. Goldberger?

A   I can't remember.   I believe I did.

Q   Do you recall that Ms. Hamilton's blood was positive for cocaine, and other substances?

A   I don't really remember.   Whatever is reflected in the trial transcript would be the best thing.

Q   Did you actually speak to Dr. Goldberger about his report and his conclusions?

A   I don't recall.   I don't believe I did.

Q   Is there any reason why you wouldn't have?

A   I didn't think it was important if I didn't.

Q   Did you consider presenting to the jury evidence of the amount of drugs in Ms. Hamilton's system?

A   I don't remember.

Ex. M at 65-67.   On cross-examination, Mr. Collins testified:

Q   Now – and your opinion handling this case and all the other murder cases that you have handled, given the degree of difference between the victim's injuries versus the defendant's injuries, do you think –

A   Well –

Q   -- it would have mattered a whole lot if you would have asked the doctor about – to go over and introduce these photographs to the jury as to the injuries on the defendant?

A   I think that would have been a bad tactical decision because it would have just emphasized the differences between what happened to the victim and what happened to the defendant. And it would undermine, even more, this defense theory, even though it is all we had under the circumstances, because you show those pictures, which are questionable of how they ever were incurred, versus the pictures of the victim, and it just –

you're not going to look real good to that jury.   I think it would
have been a bad tactical decision.

*Id*. at 90-91.

Petitioner's post-conviction counsel also asked Mr. Collins about

Ruby Taylor and Carlton Bryant, and Mr. Collins answered that he did not

remember but clarified that that does not mean he did not know about them

at the time.   *Id*. at 68-69.   Similarly, Mr. Harrison also did not remember

Ruby Taylor, at least initially, on direct examination.   Ex. M at 128.   Mr.

Harrison testified, "We're always happy to call an exculpatory witness, but

in a murder case, in a criminal case, when the defense puts on a witness, I

mean, the witness really better have it together and be able to help you or,

you know, the State's going to eat them up."   *Id*. at 129.   On cross, it was

pointed out that Mr. Harrison had called Ruby Taylor as a witness during

the penalty phase.   *Id*. at 135.   He then testified:

> Q   So it appears that you would have been aware of her before
> trial would have taken place?
>
> A   Right.   I was looking through my notes.   And what I did
> was I did a witness list, and hopefully she was on that list.   And
> I know – oh yeah, here we go.   On October 19th, 2008, I sent a
> memorandum out to Ms. Ruby Taylor and about nine other
> folks, making sure they understood when the trial was, where
> we were going to be meeting and things of this nature.   So that
> I could go over their testimony before they took the stand.
> So I had forgotten her now, but I certainly asked her to testify.

And she did so – she did so back then.

*Id.* at 135-36.   Mr. Harrison indicated that Ruby Taylor is the mother of Petitioner's child and she testified that she did not know Petitioner was using drugs.   *Id.* at 136-37.   He explained that one thing he tried to do during the penalty phase, with witnesses such as Ruby Taylor, "was humanize Mr. Daniels" as "the facts of the case were pretty bad, but the evidence was that he is a good person."   *Id.* at 137; *see id.* at 145-48, 150. See also Ex. M at 30-36 (testimony of Ruby Taylor at evidentiary hearing that the first time trial counsel spoke to her was during the trial, she was willing and available to testify during the trial, at the time of the offense Daniels was her boyfriend, she was staying at the house where the incident occurred but she had left earlier that day and did not return to the house for two weeks, and when she returned, she realized some of her jewelry was missing).

(b)  Take Depositions

In denying this claim, the state post-conviction court made the following findings on the record at the conclusion of the evidentiary hearing:

> I think that certainly is not an unreasonable strategy.   It
> does not fall outside the bounds of reasonably competent
> performance under the prevailing professional standards.   And
> certainly there is no evidence to show, had depositions been

taken, what else would have been learned to help the defendant out in the guilt phase of his case.

In fact, it is commonly – I've heard commonly from defense attorneys that they may talk to folks, but they don't like to take depositions and educate the State on what their theory is because some of their theories are pretty creative.   And if they start taking depositions, then they don't get to blindside the State at trial.

So that certainly is a common – and, you know, maybe in civil cases, you know, those attorneys run around and take all kinds of depositions.   That's what they do.   But in criminal cases it has been my experience that that is considered a sound and reasonable course of action, especially when you have a case where the stakes are so high, as they are and were for Mr. Daniels.

So that was certainly a very reasonable, competent decision by counsel.   And there is no evidence that the taking of any deposition would have resulted – not taking any deposition would have resulted in prejudice to the defendant.

Ex. N at 233. On appeal, the First DCA affirmed.   The state court's ruling is entitled to deference and review is limited to the record before the state court.   *See* <u>Cullen</u>, 131 S.Ct. at 1388.

The record supports the post-conviction court's findings.   In particular, at the evidentiary hearing, Petitioner's trial counsel, David Collins, testified he did not know whether depositions of Cristopher Grady or Christina Miller were taken.   Ex. M at 69.   On cross-examination, Mr. Collins testified that it is not unusual for him to not take depositions:

Q   Is it unusual for you not to take depositions?

A   No.   There are a lot of times I don't take depositions in cases I actually know I'm going to have to try.   Unless there is a – what I feel is a question in the reports, unless I think there is a motion to suppress, some kind of illegal type of act, and I know I'm going to try the case, unless there is just something that's just out of the ordinary, I make a conscious decision a lot of times not to take depositions because all it does is prepare the State generally.   And if we fly under the radar and announce ready for trial when it hasn't been brought to y'all's attention a lot, we're usually in a better posture if we're going to have to try the case.

*Id.* at 98-99.

### (c)   Have Daniels Testify

In his Rule 3.850 motion, Petitioner alleged his trial attorneys performed ineffectively by not having him testify at his trial.   Ex. K at 25-26. The trial transcript reflects, however, that Daniels told the judge he discussed testifying with his attorneys and he decided not to testify. Specifically, during the trial, after the State rested, the following transpired:

THE COURT:   Okay.   I'm sure you will explain this to your client, but let me make sure Mr. Daniels understands that the decision of whether to testify in a criminal case is one of only a couple of decisions that, although your lawyer's advice on it will be real important, in the end it's up to you to make that decision.   Do you understand that, Mr. Daniels?

THE DEFENDANT:   Yes, Your Honor, I do.

THE COURT:   I know you guys have talked about it a lot

already, but make sure you take this opportunity during this upcoming break to ask him any questions that you have about your absolute right to remain silent and any ramifications of you testifying or not testifying.   Okay?

THE DEFENDANT:   Yes, ma'am.

THE COURT:   Okay.   So why don't we take a break until 11:00.

MR. DAVID COLLINS:   Thank you.

THE COURT:   Okay.   Thanks.

(Brief recess)

THE COURT:   Mr. Collins have you had a chance to talk to your client?

MR. DAVID COLLINS:   Yes, Your Honor, we have.   Mr. Daniel's [sic] position is that he will not be a witness in this cause.   If you have any questions, I have no objection to the Court's colloquy.

THE COURT:   Okay.   So Mr. Daniels, have you had a chance to talk to your lawyers about whether or not you want to testify?

THE DEFENDANT:   Yes, Your Honor, I have.

THE COURT:   And what have you decided?

THE DEFENDANT:   I decided not to, Your Honor.

THE COURT:   Okay.   Do you have any questions that they were not able to answer?

THE DEFENDANT:   No, Your Honor, I don't.

Ex. D at 385-86.

At the evidentiary hearing on his Rule 3.850 motion, Petitioner

Daniels testified:

Q   And can you tell the Court right now, had you testified, what it is that you would have told the jury?

A   Well, pretty much the same as I told them [his trial attoneys]. I met Ms. Hamilton through a drug dealer.   Before then, I didn't know her.   We smoked several hundred dollars worth of crack cocaine.   We smoked pretty much all day and into the night.

Pretty much at one point she said she had to use the rest room and left out of my vision while I was in the room and ended up up in Christina and Mr. Miller's room.   And I found her in there looking through their property.   And I sent her away.   But she came back and ended up stealing some more stuff.   Well, the first time I can't really say she stole something, but she had some cigarettes that they had in their room.   And so I did take them from her.   So I don't know what she had left with the first time.

But the second time I was aware that she had stole something.   And it started an altercation between such, which led outside.   Which after that right there, it kind of escalated when it got outside.   I did strike her in the head with a brick a couple of times.

Pretty much after that right there, it ended up going back to the house, which I did not drag her up the steps.   But she did fall at the door of the house, which I did pull her from one side of the door to the other.   And at that point, Mr. Miller – and Mr. Grady and Ms. Miller got involved.   And we ended up in the kitchen.   I tried to stop the bleeding after I realized, you know, I was tripping or whatever you want to call it.   I tried to stop the bleeding or whatever.

> And Ms. Miller and Mr. Grady decided they was going to leave.   And when they left, me and the deceased got into another altercation where she ended up hitting me in the private area.   And I went down a little bit.   And she went to acting crazy, had a knife, swung it at me a few times, tried to stab me. And I grabbed a knife and I swung back and cut her throat. The police came.   I got scared and ran, turned myself in at Quincy jail.

Ex. N at 152-53.   Petitioner testified that he met the victim through Carlton Bryant, a drug dealer.   *Id.* at 153.   (Carlton Bryant did not testify at the evidentiary hearing.)   Petitioner further testified to what happened when he killed the victim:

> Well, what happened was after they [Mr. Grady and Ms. Miller] left, I accused her again of stealing.   And she said that she wasn't stealing, and actually asked for a mirror to check herself in the mirror before I was to walk her down the road. Actually, she ended up with one of my T-shirts on because of the fact that when we got ready to leave the first time, she stopped me and she was like, I can't leave out the house like this right here.   Because there was blood all over her shirt.   So she put on one of my black T-shirts and asked for a mirror. Well, as I was looking for the mirror, I guess she went in her purse or whatever and got something and looked at the lacerations that was on her head.   And when I came back in with her, you know, I tried to pat her down again.   That's when she hit me, attacked me, and started screaming that I hadn't paid for what I had done to her.

*Id.* at 156-57; *see id.* at 168-72.   He testified that the victim had armed herself with a butcher knife and came at him, so he "grabbed a knife from off the kitchen counter. . . . what they call a bread knife," with a rounded

end and a serrated blade.   *Id*. at 157.   Petitioner testified his trial attorney

advised him not to testify because his attorney "felt like I would incriminate

myself if I testified."   *Id*. at 162.

In denying this claim, the state post-conviction court made the

following findings on the record at the conclusion of the evidentiary hearing:

> Well, first of all, I think that the defendant's testimony
> actually corroborates Mr. Collins' testimony, and Mr. Harrison's
> testimony, and Ms. Jordan's testimony today, and the testimony
> of the defendant's uncle, that if he would have called the
> defendant – first of all, as, again, I said, the defendant's
> testimony I think would significantly hurt him if he had gotten up
> and testified as he did here today.

> It is just – his story is just completely unbelievable.   And
> then his story completely contradicts all the other eyewitness
> accounts, contradicts what he told two attorneys, a
> psychologist, and Ms. Jordan.

> And so, No. 1, I think counsel would have committed
> ethical – and [sic] ethical violation if they allowed him to testify.
> But he said to the court that he made the decision not to testify,
> and that that was his decision.

> But either way, I don't find that his not testifying was in
> any way prejudicial.   In any way, it was helpful, if he was going
> to testify as he did here today.   Because I think that would
> have absolutely risked a possibly different outcome in the
> penalty phase.

Ex. N at 234-35.   On appeal, the First DCA affirmed.   The state court's

ruling is entitled to deference and review is limited to the record before the

state court.   *See* Cullen, 131 S.Ct. at 1388.

The record supports the state court's determination.   As indicated above, Petitioner Daniels specifically told the trial judge he discussed testifying with his attorneys and he decided not to testify.   Ex. D at 385-86.

In addition, at the evidentiary hearing, Petitioner's trial counsel, David Collins, testified he did not have an independent recollection of a conversation with Petitioner concerning his right to testify but he further explained, "I'm sure it took place because I'm sure the Judge made it take place, if I hadn't.   So I know that it took place."   Ex. M at 70.   He testified that he generally has a separate conversation outside the presence of the judge.   *Id.*   He testified that he did not specifically recall what his advice to Daniels would have been but thought it would be not to testify, although he made it clear it would have been Daniels' decision:

> Q   Do you know if Mr. Daniels wanted to testify?
>
> A   I know Mr. Daniels was very – he was a good client and he generally followed my advice.   So whatever my advice was is what probably resulted in him either not – or I don't believe he testified so.
>
> Q   Do you know what your advice would have been?
>
> A   I believe it would have been for him not to testify.   But, again, I can't recall.   It is always his decision.   That's one of those things we lawyers can't make up for them, and that's shy

the Judge ensures that.   And there is usually a colloquy on the record between the Judge and the defendant making sure they understand it is his decision and his decision alone, and not his attorney's decision.

Q   Do you know why you would have advised him not to testify?

A   I can't remember, but it was probably because there wasn't a lot of good stuff going to happen.   He would have to explain a lot of things.   So I can only speculate.   I don't really remember.

*Id.* at 70-71.   Mr. Collins also addressed the importance of testimony from

Daniels, given the self-defense theory:

Q   Would it have been important for a theory of self-defense to have him testify since, as you mentioned earlier, he was the only person there?

A   Yeah, but you see, the theory we put on was the only one we could put on for self-defense and maintain our ethics. Okay.   I cannot knowingly put on evidence that I don't believe is truthful.   So we put on the best – see, that's what happens sometimes when you're lawyering.   You lawyer with these theories, and they are the best you have at that time, that's all you've got.

And then later on – I've been where you're at before.   We come back and we start looking at these things and say, well, that wasn't such a good theory maybe.   Well, heck, it was the best we had.   I can't put a client on if I know that he is going to say B and I'm out there selling A.   And then if I'm selling A, and I know that there is B, I can't tell him to say A.   I can't.

He has got to – he is better just to sit there and not say nothing than go up there and get caught up by these two

lawyers in a story that's probably going to get you the death penalty. So it is not all that simple, you know. We work with mirrors and smoke and all this other stuff. We don't deal in absolutes. So that theory of self-defense was the best we had for an all-or-nothing strategy. We should have gone with a second degree.

But we got lucky. We avoided the death penalty anyway. And we had our shot at trying to sell the jury on acquittal. It was a dangerous – it was a dangerous strategy. But we were able to do that and avoid the death penalty still, so. If he got on the stand, as nice as he is – and he's a fine young man. He did a bad thing, but he is a good person. It would not have been pretty putting him on the stand.

These are – these are good lawyers. And they do not take any mercy when they're – I'm not saying they are bad people, but they were going to tear that story apart because they had witnesses that saw what happened outside. Okay. And all I had was, well, they didn't see what happened inside. So – and there is a knife inside. So, you know – and his hands, you know, were injured to a certain extent. But it was tough. It was just tough.

Q   Did Mr. Daniels tell you that the knife recovered by the police was not the knife that he used to defend himself?

A   You know, I believe he did tell me that. That's the one thing I do recall. I think he told me that.

Q   Was there any investigation done into the second knife?

A   I don't remember.

Q   Would Mr. Daniels – would his testimony have corroborated the defense of self-defense?

A   It depends when you ask me. It might have at trial, but it

wouldn't have been consistent with other evidence.

Q   When was the decision made that he was not going to testify?

A   Probably during the trial.   That's just guessing, but I'm thinking probably during the trial.

*Id.* at 71-73.

Similarly, Mr. Harrison testified regarding the decision of Daniels not

to testify:

Q   Do you recall whether Mr. Daniels indicated in your presence that he wanted to testify?

A   Mr. Daniels indicated that he did not want to testify, ultimately.   In other words, I'm talking about when we had that discussion with Mr. Daniels during the trial.

Q   Do you recall what the specific discussion was?

A   Yes.   There was some – there was some thinking that maybe he should.   I mean, we looked into his prior record.   He did not have a prior felony conviction, I don't believe.   At the time, I believe, there was one outstanding grand theft charge, but it had not been resolved so the State could not impeach him on that.

And, you know, it was Mr. Daniels's life that was on the line here.   And if he had wanted to testify, we would have never prevented that.   But he told David ultimately that he chose not to.

Q   Was it your advice for him to testify or not testify, or Mr. Collins's advice?

A   That was – I think that – I will tell you this:   For better or worse, generally it is very dangerous, it is very dangerous for a defendant to testify.   David Collins has one of the best win records of any lawyer in the state of Florida.   And I don't think in the trials that he won he ever put the defendant on the stand. When you do that – you know, these people are trained to – they love it, you know.   They hurt you, usually.

Q   So based on that answer I'm concluding that his advice would have been for him not to testify?

A   You know, David – I don't know what he said in here, but if you got a chance to get to know David Collins a little bit, he is a free-spirited guy.   He would tell the guy if he wanted to testify, go for it.   I mean, it was his life.   But I think, frankly, it would have – it is always prudent to warn a defendant that, you know, you're getting really – you're really risking it when you do that.

Ex. M at 129-30.   On cross, Mr. Harrison further explained reasons why he

thought it was not a good idea for Petitioner to testify:

A   . . . . And it is to some extent the things that he told Chris Robison.   And that is that the lady's offense was that she stole some of his contraband; perhaps also some of his personal belongings.

And one of the things that we tried to keep away from you and your fellow counsel as that Mr. Daniels wasn't so much a user as in the business.   And in the business, if somebody takes your drugs, you know, bad things happen.   And this lady was killed because she had taken his drugs.   It wasn't a situation where she started a fight with him.

So if he got up on the stand and said to me what he – what he also told to Dr. Robison, this would not be good, certainly wouldn't support a self-defense argument.   Especially the last thing that I wanted you to be able to use against me,

and I was very worried that you were going to, was that – the reason her throat was cut.

And the reason her throat was cut – it was never anything that Mr. Daniels felt he had to hid, he told Chris the same thing – that she tried to get away so he slit her throat.   Well, under the aggravators, you know, witness elimination is something that you would have had right handed to you.   And I didn't want you to have that.   And I didn't want that to come out.

Q   So one of the reasons – or part of the factors that you considered in advising the defendant not to take the stand and not wanting to put the defendant on the stand is, one, you were afraid if he took the stand and told his story, that it might come out that he was, in fact, a drug dealer?

A   Correct.

Q   And that he wasn't using that many drugs that night?

A   That's the second thing.

Q   All right.   And that he knew and understood what he was doing?

A   Correct.

Q   And that he killed the lady because she tried to steal drugs from him?

A   Correct.   And because – the last act was her throat was slit viciously.   I mean, it cut the windpipe and everything.   And, very matter-of-factly, the reason was she was trying to get away.   And what – my whole, whole effort during the penalty phase was to limit you in your ability to cite to statutory aggravators. . . .

*Id*. at 141-43.

Based on the foregoing, Daniels has not shown that the state court's adjudication of this ground involved an unreasonable application of clearly established federal law or that it based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be denied.

### Ground 4:   IAC – Self-Defense Theory

In his fourth ground, Petitioner Daniels alleges his trial counsel provided ineffective assistance by failing to prepare an adequate theory of self-defense.   ECF No. 1 at 23-28.   Daniels raised this claim as the third ground in his Rule 3.850 motion.   Ex. K at 30-37.   The state court denied the claim on the record at the conclusion of the evidentiary hearing:

> We heard argument about counsel preparing an inadequate theory of self-defense.   I think based on my comments about the witnesses that we have outlined, that the defense counsel prepared as good a theory of self-defense as was available to the defendant.   And I don't find that their conduct was unreasonable or ineffective in that manner or that the outcome would have changed had these folks been able to testify.

Ex. N at 232.   On appeal, the First DCA affirmed.   The state court's ruling is entitled to deference and review is limited to the record before the state court.   *See* <u>Cullen</u>, 131 S.Ct. at 1388.   The record supports the state court's ruling.   As set forth in the analysis of Ground 3, *supra*, trial counsel

pursued the self-defense theory at Petitioner Daniels' insistence and tried to make the most of it given the circumstances.   *See, e.g.*, <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994) ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.").   Indeed, the trial court gave the jury instructions to determine whether Daniels had acted in self-defense.   Ex. E at 440-44.   *See, e.g.*, <u>Mosansky v. State</u>, 33 So. 3d 756, 758 (Fla. 1st DCA 2010) ("The defendant has the burden of presenting sufficient evidence that he acted in self-defense in order to be entitled to a jury instruction on the issue.").

Petitioner Daniels has not shown that the state court's adjudication of this ground involved an unreasonable application of clearly established federal law or that it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

## Conclusion

Based on the foregoing, Petitioner Selvin Daniels, III, is not entitled to federal habeas relief.   The § 2254 petition (ECF No. 1) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is

filed, the court may certify appeal is not in good faith or party is not

otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the

§ 2254 petition (ECF No. 1).   It is further **RECOMMENDED** that a

certificate of appealability be **DENIED** and that leave to appeal in forma

pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 31, 2016.


**S/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this
Report and Recommendation, a party may serve and file specific
written objections to these proposed findings and recommendations.
Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served
upon all other parties.   A party may respond to another party's
objections within fourteen (14) days after being served with a copy
thereof.   Fed. R. Civ. P. 72(b)(2).   Any different deadline that may
appear on the electronic docket is for the Court's internal use only
and does not control.   If a party fails to object to the magistrate
judge's findings or recommendations as to any particular claim or
issue contained in a Report and Recommendation, that party waives
the right to challenge on appeal the district court's order based on the**

**unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**